So that would be 409-0297, 0335, 0392, and 0430. Justice Steinman is not with us today because he's ill. He will be listening to this by tape this afternoon. We have for the appellant, Laurel Spahn. Is it Spahn? Yes. And for the appellee, James Majorson. Who will be arguing? I will be arguing. Okay, Mr. Tepe. All right. Ms. Spahn. Good afternoon. May it please the court, counsel. I've just been talking with my opposing counsel for the last 20 minutes or so. So I know that it's their job to represent the state in these matters. So I'm about to say some harsh things about how these cases were handled, not necessarily reflecting on the appellate counsel, but more on the trial counsel trial court. These four consolidated cases show that commitment for psychiatric purposes means hospitalization. These four cases show that little, if any, thought is given to the dispositional part of a commitment proceeding. These four cases show a complete disregard for the concept of least restrictive alternative. And what is really sad about this is that this is 16 years after this court's Luttrell case that talked about these issues and criticized the slipshod manner with which these cases are handled. Slipshod manner. Those are words from the case. Commitment represents a serious deprivation of liberty. When a court finds that a person is subject to commitment, the court is required to commit the person to the least restrictive setting possible. This protects the committed person so that the state is not taking away her liberty in a harsher way than is necessary to protect both the committed person and the public. In these four cases consolidated today, short shrift is all that was given to disposition. Now I went over this argument with a trusted advisor and my husband said to me, Why would you say short shrift to the court? That seems pretty colloquial. So I looked it up. And short shrift means careless treatment, scant attention. So I think short shrift is entirely appropriate. Short shrift was given to disposition, let alone the important concept of the least restrictive alternative. Counsel, have you ever actually attended any of these hearings? Not in the fourth district, but I regularly represent respondents in the first district in Cook County. I've done commitment hearings for years in Sangamon County. I've never seen what it's like in the first. I believe the prosecutors and the defense lawyers have a very difficult job to do in these hearings, as does the court. Invariably, these hearings are conducted in a very small room, smaller than our council chambers here, and with a court reporter and witnesses and a respondent who is in very dire straits. There is a reason for haste in any courtroom, let alone these kinds of hearings. So I caution you against being too critical. I think under the circumstances, everyone involved in these cases does their best. I appreciate that, Your Honor, but I disagree with you when it comes to this matter of disposition. I think that disposition is being treated as an obligatory prove-up. The questions are asked to have them on the record, but there's really not the attention that's given. And maybe that's because of some of the circumstances. Just for comparison, in Cook County, cases are heard in a courtroom for the most part. There are two council tables, there's a bench, there's a space for the court reporter, there's a spot for the witness, there's room for an audience. We have students who are nursing students, law students. These hearings are held in the cramped quarters of a small side room at the facilities because the judges are good enough to take their time and travel to the hospitals and to McFarland Zone Center, which does not lead to the finest of courtrooms. Oh, and I think that is also very helpful in many cases, because sometimes respondents don't want to come to court. They wish to have their hearing heard at the facility. And Cook County tries to be accommodating to that, and there are some changes in Cook County even right now to try to have more hearings at the hospital. So I think that is wonderfully accommodating of Sangamon County to do that. And I think it's very possible that it means more respondents are able to attend their hearing. I can tell you that in Cook County, sometimes a person will not want to come to court at the mental health courtroom because it means they're going to be coming from a private hospital restrained on a gurney in an ambulance to get there. Now, we tell our clients, we'll get you out of the gurney as soon as you get there, but it's a humiliation for them. They don't want to have to do that just to come to court. So this is a criticism of the attention that's paid to disposition. And this is no criticism of the courts and their accommodation of respondents and where the hearings take place. I know that can be difficult. But when disposition is treated as an obligatory prove-up, we are missing the constitutional implication. We are missing the fact that the treatment team needs to be considering alternatives to hospitalization. And these four cases show that hospitalization is the conclusion, it's maybe even the bias, it's the path of least resistance. And the way the questions are asked even illustrates that. The questions are leading questions. And you're recommending hospitalization for this respondent, right doctor? The state has confessed error in two of these four cases. The two cases where error is confessed are Aaron R. and Charles K. But the state argues in the remaining two cases that hospitalization was okay, despite conclusory answers to leading questions about disposition and a presumption that hospitalization is the only possible disposition. This is all I have to say at this point. If there are specific questions I could answer, I'd be happy to answer questions about the specific cases. I'd also like time to respond to the argument the state makes. You may have rebuttal. Thank you. Thank you, counsel. Mr. Teefee? May it please the court? Counsel? My name is John Teefee, and I wrote the briefs in Pamela M. and Mona A. in this case. Those were the two cases that we did not concede. I think it's important. The respondent's argument seems to make it sound like the doctors, the experts in both of these cases, had one-minute testimony, took the stand, and basically made a conclusory statement that hospitalization is the least alternative, is the least restrictive alternative. But I think if you look at the record in this case, look at the testimony of the doctors in both of these cases, it's clear that the doctors in Pamela M., Dr. Robinson, and Mona A., it was Dr. Kripakaran, I guess is how you would say that, both of them testified in pretty significant detail to the condition of both of these respondents. I'm going to start in Pamela M., and the respondent's specific argument in Pamela M. is that the dispositional report was insufficiently detailed in this case. Specifically, the respondent argues that the report did not have a projected timetable for attainment of the goals, and it did not have information regarding the appropriateness and the availability of alternative treatment plans. My first argument in Pamela M. was that the respondent forfeited this argument on appeal. There was a dispositional report filed in this case. Her argument is that it was not detailed enough, and there was no objection made at the trial level. So my first argument is that she has forfeited review of that issue on appeal. My second argument is that there is no detail in the statute, and there is no detail in 5.3-810. Case law does not indicate what exactly this projected timetable should look like. I'm talking about Pamela M. still. In Pamela M., the dispositional report contained specific goals, and it had a detailed analysis of the respondent's progress toward those goals. It covered a three-week span. It gave the projected goals that the respondent should attain during those three weeks, and then it also showed her progression toward those goals. And my argument is that, according to the statute, that is sufficiently detailed to be proper under the statute. Respondent's second argument is that there was no alternative treatment suggestions in Pamela M. This Court has ruled in the past that the dispositional report does not need to contain a quote, detailed report on treatment alternatives. The report in Pamela M. indicated that the respondent was living alone, was not married. It also indicated that the respondent's neighbor had been taking care of the respondent. Dr. Robinson specifically testified that the respondent in Pamela M. could not be returned home because her house was a mess, she was sleeping outside, she had brought a box cutter to a neighbor's house, and she could not provide for her basic needs without constant supervision. Dr. Robinson in that case in Pamela M. also compared admission into McFarland with admission into Memorial Medical, comparing those as alternative options. So my argument in this case is that Dr. Robinson did answer two questions. Is hospitalization the least alternative, least restrictive alternative? And he said yes. So if you just take a snapshot of that, it could be argued that that was a conclusory testimony. But given the total of Dr. Robinson's testimony, given the dispositional report, I think it's clear in this case that Dr. Robinson took in a number of factors and made an informed and educated decision that admission, hospitalization was the least restrictive alternative in Pamela M. Turning over to Mona A., the argument in that case was again that Dr. Kripakaran made a conclusory opinion that hospitalization was the least restrictive alternative. And again, if you look at the doctor's, the expert's testimony in that case, it's clear that there was also a dispositional report in Mona A. In the report, the treatment plan, it recognized, specifically it recognized Mona A.'s strengths. She has a support system. She has relationships. It quoted that her financial resources were a strength. And it also stated that the respondent was currently living with her brother at the time that she was admitted. However, and in that case again, Dr. Kripakaran specifically endorsed that treatment plan. He recognized that in the treatment plan, testified to the details of that treatment plan, and even after endorsing the treatment plan, he specifically testified that admission into McFarland was the least restrictive alternative. And he said this was until the respondent's psychiatric symptoms were stabilized to the point that she was not considered a danger to herself or others. The record also indicated that, and as the respondent noted in her brief, it was unclear whether the respondent was involuntary admitted in the past. But the record did indicate that the respondent had prior admissions, whether they were involuntary or voluntary. Her last release from the hospital was in December of 2008. And after that, the record indicated that she was not attending her scheduled appointments, and she had not been taking her medications. And specifically again in Mona A., Dr. Kripakaran testified that, and I have a pretty long list of things here. And I'm just doing this to show that Dr. Kripakaran had detailed explanation for why hospitalization at McFarland was the least restrictive alternative. It's not that he just took the stand and briefly said, yes, it's the least restrictive alternative. He specifically endorsed the treatment plan, and he specifically testified that Mona A. needs day-to-day assistance. She cannot care for her basic needs. She does not have a place to live, and he is not sure where she will go after this. She cannot take care of herself. He specifically testified that she posed a threat to herself and others, was loud and paranoid. She believed other people were trying to kill her. During one of the meetings with the doctor, Mona A. threatened him, and the doctor felt he feared for his safety. And Mona A. also had problems with hygiene, and she cannot wake up by herself without assistance in the morning. The respondent in Mona A. also testified that her family was out to get her, and that she was living with her brother when she was brought into police custody. And as the treatment plan indicated, the respondent argued this on appeal, that it was possible that she could live with her brother as an alternative to hospitalization or another family member. And this testimony specifically shows the respondent said that she was living with her brother when she was taken into police custody, and she's scared that her family was out to get her. And I think both of those... He testified that she was living with her boyfriend. Her boyfriend? I'll have to check. I have it in my notes that she testified that she was living with her boyfriend when she was arrested. I guess it's according to documents, the comprehensive physical, psychiatric, and social investigation, that she lived with her brother, although she reported she'd recently resided with her boyfriend. I'm sorry. The information that I have is that she was living with her brother at the time she was arrested, and if I'm incorrect on that, I apologize. So what was the indicator that her brother was an option? I believe in the treatment plan, and it didn't specifically say that living with her brother is an option, but in the treatment plan it did say that she had been living with her brother, and I think that that can be considered, as the doctor endorsed the treatment plan, that he did get to see that she was living with her brother, and I think it's fair to say that that was, the fact that it was in the treatment plan, that the doctor probably considered that as an alternative treatment. Well, what I have in that report, the social worker completed, Kathy Love, she checked the no box for whether alternative treatment was more appropriate, and then continuing to stay with respondents for their Alberto is likely an option, but has not yet been able to be confirmed. Now, Love did not testify. Apparently, indicated that had been unable to contact respondents' brother by telephone during this hospitalization. What's your question, Your Honor? I'm sorry. Do we have any idea what efforts were made to contact the brother? The record does not make any indication of what efforts were made to contact the brother. No. And how much time had expired a week since she had come in? Between the report and the hearing? From the time she came in to the hospital. I'm sorry, I don't understand. From the time that she was admitted and the dispositional order. I'm unsure about the amount of time. And I do not know what, there was no testimony in regards to what efforts were made to contact her brother. That is, that concludes the arguments that I have. If Your Honors do not have any further questions. How could you possibly do a dispositional report without contacting the brother if you don't know whether or not that's an option? I am unsure. I think that based on the testimony from the doctor and respondents' own testimony, I think was sufficient evidence to show that living with her brother was not a possible alternative. Regardless of what, I'm not sure what contacting the brother, and even finding out whether he was open to that possibility or not, how that would really affect whether that was really a viable option. Do you want to talk to him just to get a psychosocial history? I think from, just from my report. We've got a doctor who doesn't know her, and a self-report from the respondent who you allege is crazy. Right. So, I mean, in terms of actual background for this unfortunate person, you know, the doctor doesn't really have any first-hand knowledge of background. Her word is presumptively unreliable. So, how can you say that you've got a good background on this person to make an informed decision on where she ought to go? Yeah. I think we do have, I think it would have been a very good idea to talk to the brother. The brother should have been contacted, and I don't want to speculate that he was or wasn't. I don't know. He should have been contacted, for sure. I think the evidence beyond that, just given the list of things that Dr. Kripakaran testified to regarding that she cannot take care of herself, and she still continued to pose a threat to herself and others. His interactions with her showed that she was aggressive. I think that testimony alone shows that living with the brother probably was not an alternative, a reasonable alternative. But without talking to the brother, I mean, he could have given them more information. I totally agree with that. He should have been contacted. But I don't think contacting the brother alone would have changed the order in this case. Well, we don't know, do we? We do not know, Your Honor. If there are no further questions. Thank you. Thank you. Thank you. The attorney for the state just gave a lot of factual information. I did address some of that, quote, factual information in the reply brief for Mona A. And that's a problem with relying on hearsay, double hearsay, triple hearsay as fact. And Justice Appleton, you pointed out, or maybe it was Justice Meyerkoff, we didn't hear from the social worker who wrote that report. We didn't hear from the police officers who picked up Mona A. And do you actually hear from those kind of people in your hearings in the First District? Yes, we do. Really? Because there needs to be substantive facts that form the basis of the observations. We cite to Wilson v. Clark, and the doctor can rely on hearsay, but it has to have a reasonable basis. Therefore, it's important for us as trial counsel to interview these people who allegedly saw erratic behavior in the streets and find out what actually happened. And sometimes it doesn't happen the way it appears to in the petition. But aren't you asking us to rely on the fact that Love indicated that Alberto, the brother, was likely an option? And that's simply in a report, so you're asking us to rely on hearsay for the fact that she was capable of living outside the restricted hospital setting? You know what? That's all we have here, and I'm saying it's not enough. And I'm not, I don't want this to be, I'm not making this a factual case, because really we don't have any facts. We have conclusions, and everything that the state talked to you about points to probable mental illness. One of the things you said, Justice Appleton, was that the respondent, talking about Mona A., was presumptively unreliable. And I'd like to just talk about that for a minute, because was she? She was taking voluntary medication at the time of her hearing. So she, the doctor accepted her consent to that medication. There was no court order, and the record does show she was taking medication. So apparently she was reliable when it came to making that decision. My point is, the state didn't think she was reliable. You're right. The state may have presumed the unreliability there. And in Pamela M., I think Pamela M. is probably the most absurd case of these four. Because in that case, you may remember, the doctor said, let me back track one minute. The doctors in these cases did not opine that hospitalization was the least restrictive alternative. The question the doctor answered in each of these cases, are you recommending that she be treated at a DHS facility? Yes. There's a recommendation. There's not even expert opinion that this is the least restrictive alternative. That's just kind of glossed over. Sometimes in some of these cases there's been a follow-up question. And has a treatment plan been formulated? Yes. And is that treatment plan the least restrictive? Yes. So we have, compared to math, we have an answer to a problem. No work has been shown. Without the work being shown, we don't know how right that answer is. Pamela M., though, the Pamela M. case involved a doctor saying, yes, hospitalization, I recommend it. Then we have closing argument after Pamela M. testifies. What does Pamela M. testify to? I have Blue Cross Blue Shield. And then in closing argument, the state says, and we, despite the doctor's testimony recommending a DHS facility, we are now requesting that Pamela M. be committed to this private hospital. And the trial judge says, well, wait a minute. State, do you want to reopen the case? And it's then that the doctor backtracks. I see my light is on. No, it's the yellow. Oh, okay. The doctor backtracks and says, well, you know, maybe we could treat her here at the private hospital. And she has some medical issues. Maybe there aren't going to be enough doctors there. Well, there are doctors at the DHS facility. There are medical doctors that treat medical conditions at the DHS facility. But I think we could treat her at the private hospital. And this really just shows the lack of attention, the lack of concern, for what is truly least restrictive in each of these cases. Would you concede that once a doctor testifies that a patient is a danger to herself and others, that that very finding limits the options for treatment? I would not concede that. So you think that even though a respondent is found to be a danger to herself and others, that the court is obligated to consider releasing her into the public? Yes, because as this court's case in Luttrell says, there are several possibilities for placement. And the idea is to find the placement, to find the disposition that's going to protect the person and protect the public. And in each of these cases, this was not a matter of, these were not cases of dangerousness. At best, these were cases of possible inability to provide for basic needs. These were cases involving the now unconstitutional dangerous conduct standard, which we didn't argue in this case because of the strong least restrictive alternative argument here. And in each case, the trial court must look at the circumstances of the case. The treatment team must explore alternatives. And then the court must make a decision. So are you saying the court has a sua sponte duty to say, look team, you haven't explored this, I'm going to deny the petition? I think the trial court could say, treatment team, there doesn't seem to be enough information here for me to make an informed decision. I'm going to put this off for a week. Come back for the petition. That can't be done. Can't it be done for a week if the respondent doesn't agree? Well, I think it depends on the timing of the hearing. I think most of these hearings occur close to their filing date. The state can take up to 15 days of continuance without agreement of the respondent, and that's under Article 8. So often there is that leeway. If not, the court could... So yes, you're saying there is a sua sponte duty on the court's part to... I think the trial court has the duty, because this is a constitutional and more restrictive way than necessary, just for the sake of expediency. So yes, I think it's a matter of saying... Or even that, during that time period, that morning or that afternoon, saying, excuse me, can you call your treatment team right now and have them get on the phone and look into some of these things? Because it might be surprising what happens. There may be, oh yes, we got the local community mental health center on the phone, and we can set up an appointment, and we can have a case manager come and visit this person. So the court is to be the doctor then? No. The treatment manager? No. And this is no different from a court deciding a medication case. Is the court the doctor in a medication case? The court is taking all of the recommendations and listening to all the evidence, and then making a legal decision. So no, I'm not asking the trial court to become the doctor. I'm asking the trial court to enforce the treatment team's gathering of information and preparation of a report on dispositions. And that's really the most important part of the dispositional report. The dispositional report has three components. The treatment plan, the social investigation, and the report on possible alternatives for disposition. In a recent 4th District case where I can't remember now if we filed an Anders motion to dismiss or if the respondent agreed to voluntarily dismiss the case. It was not from Sangamon County. It was not from McLean County, which is where these cases are from, these four. Another county. There was the most detailed report on alternatives that I've ever seen. It was lovely. The report on disposition, the report on alternatives that was included with the dispositional report said the respondent was discharged six months ago and was discharged to a community setting. Within a week he had not done well at that particular community setting, and so we, the hospital, and the community setting worked on a bit stronger of a community setting. He also did not do well in that setting and ultimately was re-hospitalized. Based upon that, this report said, we decided that the community setting would not be most appropriate, but instead we contacted the pre-admission screening agent for our county to look into other possible placements, including nursing homes, more restrictive group homes. The pre-admission screening agent conducted its assessment and decided that this person was not yet appropriate for those other alternatives. Therefore, hospitalization is currently the least restrictive setting. And that's what we need to see in these cases. In that case, the court could be fully confident knowing that the treatment team did the work it needed to, explored alternatives, had a good reason for recommending hospitalization. Was that respondent insured? That respondent was not insured. This respondent was insured? Pamela M is the only... Was it Mona? No, no. Pamela M is the person who testified to her Blue Cross Blue Shield, and then there was the flip-flop. And she ended up being committed to the private hospital rather than what the doctor recommended in his direct testimony. So these cases are very important. Disposition is very important because if a person can be placed in the least restrictive setting, it's going to be more therapeutic. The person is going to have a better acceptance of the commitment order. In some of these cases where a person is simply committed to the hospital, where there's a math problem, we have a conclusion, we have an answer, but there's no work shown to support that conclusion. And in all of these cases, the conclusion was hospitalization. We have a person hospitalized, they're going to do whatever they can in the future to avoid that hospitalization. And if we can encourage the least restrictive alternative in these cases... And in most of these cases, there is no less restrictive alternative. Isn't that the case? I don't know if that's the case. There are community-integrated living arrangements, or SILAs. There are other types of group homes. Are there enough for the patients? Well, I can only speak from my trial court experience at Cook County, and I have seen individuals placed in a variety of settings. I've also seen individuals committed on care and custody orders to relatives or friends who then vouch for the person and say, yes, I will make sure they go to their outpatient appointments. I had a person once committed for dangerousness because he climbed cranes in Chicago. He climbed cranes from a skyscraper because he had had an injustice done to him, a legitimate injustice for which he was suing a party in federal court. But he wasn't getting anywhere. And he felt that he needed to proclaim the injustice from the mountaintop. There being no mountaintops in Cook County, he went to the next best thing. He climbed a crane, and not just once. He never intended to harm himself, he says. He didn't harm anyone, but we can't have people climbing cranes in Chicago proclaiming injustice. You know, I mean, that is certainly a danger, and he understood that. He was found subject to commitment. He walked out of the courtroom on a dispositional order where he was ordered to go into outpatient treatment and to meet with a counselor once a month for three months and to report back to the court once a month. And this person has never been re-hospitalized, came to court each time and talked with the judge and reported on his progress. So there are alternatives. And I'm sorry, I've gone way over my time. I thank you for listening. Thank you. We'll take this matter under advisement and recess for a few minutes.